[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Blue Cross Blue Shield of Connecticut , Inc. ("BC BS"), brought this action against the defendant, Carmen DiMartino, seeking temporary injunctive relief, money damages, attorney's fees and costs relating to the theft and misuse of confidential and proprietary information stored in BC BS's computer systems. The court granted BC BS's request for immediate temporary injunctive relief on June 8, 1990. At a show cause hearing on June 21, 1990, the parties entered into an agreement in accordance with which the defendant returned confidential and proprietary information of BC BS and was enjoined from using, disseminating or selling BC BS's confidential and proprietary information.
This case was tried to the court on April 24, 1991, on the basis of stipulated exhibits; affidavits of Robert Bown, Richard Ihmels and Steven Zerio; oral stipulations and testimony of Steven Zerio on behalf of BC BS. Defendant rested without introducing any evidence, and the parties have stipulated to the entry of a permanent injunction.
I. Facts
Based on a preponderance of the evidence, the court finds the following facts proven: DiMartino was a Group Sales Representative in BC BC's Fairfield, Connecticut, Group Sales Office until March 23, 1990, when his employment was terminated. He was responsible for soliciting employer groups to purchase health insurance plans and for acting as BC BS's representative to some existing groups in the Fairfield area.
In the course of his employment, DiMartino was given a confidential personal access code with which he could obtain information about BC BS group accounts for Connecticut. This information, which is stored in the BC BS computer system, is confidential and proprietary. It includes the identity of groups, their specific policies, their addresses, the size of the groups, the renewed date, and information from which their premium rate can be calculated.
As part of his training, the defendant was instructed concerning the confidentiality of company records and conflict of interest. He was given an employee handbook which contained CT Page 5950 specific provisions relating to the confidentiality of company information and conflicts of interest.
On or about March 1, 1990, BC BS initiated an audit of DiMartino's personal computer access code number. As a result of the audit, BC BS generated a printout of information accessed by DiMartino and learned that DiMartino had obtained a large quantity of information about hundreds of BC BS group accounts all over the state.
Without authorization, defendant removed from BC BS thousands of pages of documents containing information concerning a vast number of BC BS group accounts. The information included the names and addresses of the group accounts, contact persons, telephone numbers, billing and premium information, and payments records. Defendant violated company policy in obtaining this information by using his own confidential access code for improper purposes and by using the confidential computer access codes of other employees. Much of the material taken by defendant included computer printouts which far exceeded the scope of his sales territory and which were printed by him on numerous days. Several of these days were Saturdays, which were not part of defendant's work week. On one of these Saturdays, March 3, defendant used his personal access code continuously from approximately 8 A.M. until around 1:00 P.M., accessing and printing a different computer screen at an average rate of seven times per minute, throughout this five-hour period.
In addition, defendant removed from BC BS's offices a confidential listing of group account information (the "Pool Rated Group Report,") compiled in connection with a special telephone blitz conducted by BC BS in the fall of 1989. This document was used only for that limited purpose for approximately two weeks at only one BC BS location which had restricted access. Although removal and possession of this report by the defendant was unauthorized, a copy was retrieved from his apartment on March 23, 1990, by BC BS representatives. Despite his sworn statement on March 23, 1990, and other representations to Mr. Ihmels that he had either fully returned or had destroyed all such information, he returned another copy to BC BS at the show cause hearing on June 21, 1990.
Defendant has admitted misappropriating confidential and proprietary information. This information was available to Customer Service Consultants but not to the public or to agents and brokers of BC BS. The information is the product of significant investment by BC BS in its computer system. Because the integrity of the information is critical, BC BS took reasonable precautions to protect it, including limiting access, maintaining confidential compute access codes for employees, and CT Page 5951 conducting employee training on the importance of maintaining the confidentiality of this information.
DiMartino signed a sworn statement admitting that he had used his personal access code on BC BS's computer system, and the confidential personal access codes of two other employees, to obtain a list of BC BS's group accounts that he later disclosed and offered for sale to two independent insurance agents for his personal benefit and future financial gain.
After March 23, 1990, DiMartino continued to market the information for his personal financial gain by offering to sell portions of the list to agents so that they might become "agent of record" for BC BS group accounts and thereby be entitled to commissions.
At the onset of this action, the court ordered the defendant to return all documents taken, retained, or converted by him from BC BS within 48 hours after service and to disclose within the same time period all persons to whom disclosure of such information had been made. The defendant failed to comply with this order but did appear at the show cause hearing on BC BS's request for temporary injunction set down for June 21, 1990. At the show cause hearing on June 21, DiMartino turned over additional confidential and proprietary information that he had wrongfully taken from BC BS's computer system. DiMartino admitted that he had possession of BC BS confidential and proprietary information and had disclosed portions of the confidential and proprietary information to Ralph Gagliardi, Michael Coppola, James Murphy, and Kenneth Morrissey, all of whom are independent agents.
The threat to BC BS from the theft and disclosure of its confidential and proprietary information was substantial. With this information, defendant contacted brokers and agents in order to solicit those BC BS accounts without designated "agents of record" so that they could become "agent of record" and thereby earn a commission on new and existing business.
BC BS has approximately a forty percent market share of the group insurance business throughout the State of Connecticut, representing annual premiums of approximately $550 million. Commissions paid to agents and brokers of BC BS for 1989 totaled $3.6 million and amounted to $46.6 million for 1990. With approximately 11,000 group accounts, only forty percent of which had agent of record designations, BC BS had millions of dollars of exposure to additional commissions which could have resulted from the improper use of the information which defendant misappropriated. These were commissions that the company paid out of general revenues of the company, rather than as charges on the CT Page 5952 premium of the particular account. In addition to the potential exposure to liability for additional commissions, disclosure of the information would permit competitors of BC BS to underbid it on its existing business. As a direct result of defendant's actions, BC BS had to terminate the Service Fee Program.
While BC BS was unable to ascertain commissions paid or business lost as a result of the actions of defendant, it did incur attorney's fees in connection with this action. Counsel prepared the affidavits and papers which resulted in the ex parte turn-over and disclosure order, prepared a motion for contempt and supporting memorandum, applied for a capias, as well as prepared for the show cause hearing and trial. Through trial, these expenses totaled $27,999 in attorney's fees and $1,161 in disbursements. The parties have stipulated that BC BS's claim for attorney's fees and disbursements is reasonable.
II. The Plaintiff's Claims
The plaintiff's complaint contains six counts: (1) misappropriation of confidential information in violation of Conn. Gen. Stat. 35-50 et seq.: (2) wilful and malicious misappropriation of confidential information in violation of Conn. Gen. Stat. 35-53; (3) common law conversion; (4) a claim for relief pursuant to Conn. Gen. Stat. 52-570b in connection with a computer-related offense; (5) unfair competition and deceptive trade practices in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. 42-110a et seq.; and (6) breach of fiduciary duty. The plaintiff claims a permanent injunction, money damages, including damages for unjust enrichment pursuant to Conn. Gen. Stat. 35-50 et seq. and 52-520b, treble damages as well as punitive damages pursuant to Conn. Gen. Stat.52-570b(c) and 42a-110g, plus attorney's fees and costs.
III. Trade Secrets —
Section 35-51 (d) of the General Statutes defines "trade secret" as —
 information, including a formula, pattern, computation, program, process, drawing, cost data or customer list that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
Conn. Gen. Stat. 35-51 (d) (emphasis added). CT Page 5953
In evaluating trade secrets, Connecticut courts have considered the following factors: (1) the extent to which information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competition; (5) the amount of effort or money expended by the employer in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others; (7) the extent to which the employer-employee relationship was a confidential or fiduciary one; (8) the method by which the employer acquired or compiled the information; and (9) the unfair advantage gained by the employee from using the employer's information. Nationwide Mutual Ins. Co. v. Stenger, 695 F. Sup. 688, 691 (D.Conn. 1988 ); Town Country House Homes Services, Inc. v. Evans, 150 Conn. 314, 319, (1963); Holiday Food Co. v. Munroe, 37 Conn. Sup. 546, 551 (1981). Applying these factors here, it is clear that the information which the defendant misappropriated contained trade secrets.
The information misappropriated includes virtually all identifying, underwriting, billing and payment data on all of BC 
BS's group accounts. The information was not generally known to BC BS agents and brokers or to the public. It was made available to Customer Service Consultants, such as defendant, basically through access to confidential computer access codes. Customer Service Consultants, including defendant, were instructed on the confidential nature of the information and given an employee handbook containing provisions on confidentiality and conflict of interest. The data stored in the BC BS computer system represents a significant investment by BC BS. The company maintains the confidentiality of the information by special means. The defendant's removal and use of this material was unauthorized. Defendant has admitted that this information was confidential and proprietary to BC BS. These admissions constitute judicial admissions by the defendant. King v. Spencer, 115 Conn. 201, 204 (1932); Tait LaPlante, Handbook of Connecticut Evidence, 6.7.4 and 6.7.5 at 135. The defendant removed from BC BS large amounts of confidential information on numerous occasions for personal purposes. Had he been successful in his efforts to sell this information for his personal gain, BC BS would face considerable monetary exposure for additional commissions as well as the potential for substantial amounts of lost premiums.
In light of the uncontroverted evidence, the court concludes that the information taken from BC BS by defendant is confidential and proprietary. Defendant's actions constitute misappropriation of trade secrets both at common law and pursuant CT Page 5954 to Conn. Gen. Stat. 35-51 (d).
By his own admission, DiMartino misappropriated trade secrets of BC BS within the meaning of the Uniform Trade Secrets Act, Conn. Gen. Stat. 35-50 et seq. Under the provisions of this statute, "misappropriation" is defined as:
 (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) disclosure or use of a trade secret of another without express or implied consent by a person who (A) used improper means to acquire knowledge of the trade secret. . .
Conn. Gen. Stat. 35-51 (b).
Moreover, the misappropriation was wilful and malicious. DiMartino is liable to BC BS under Conn. Gen. Stat. 35-53.
Because BC BS's confidential and proprietary information was taken from its computer system, DiMartino is also liable under Conn. Gen. Stat. 52-570b, which provides a cause of action for computer-related offenses. Specifically, this statute creates a civil remedy for violations of Conn. Gen. Stat. 53a-251, which defines "computer crime." DiMartino's conduct constituted theft of computer services and misuse of computer system information in violation of 53a-251 (c) and (e).
Further, DiMartino's conduct constitutes common law conversion. Conversion is the intentional exercise of dominion or control over personal property that seriously interferes with the rights of another in that property. Restatement (Second) of Torts 222A. DiMartino intentionally, wilfully and with bad faith converted BC BS's confidential and proprietary information to the detriment of BC BS.
In addition, DiMartino's misappropriation of the information constituted a breach of fiduciary duty. DiMartino knew that the information was confidential and proprietary and that the information had great value to his employer. Under the circumstances, he owed a duty to BC BS to protect the secrecy of this information. His theft and subsequent disclosure to third parties constituted a wilful and malicious breach of that duty. See Town Country House Home Services, 150 Conn. at 319, when the court stated: "The law will import into every contract of employment a prohibition against the use of a trade secret by the employee for his own benefit, to the detriment of the employer, if the secret was acquired by the employee in the course of his employment." CT Page 5955
Finally, DiMartino's conduct constitutes a violation of CUTPA. Because he attempted to use the information taken from BC BS's computer systems in an effort to secure financial gain by offering the information to various agents, his acts constitute unfair and deceptive practices as unlawful, unethical and violative of public policy. Web Press Service Corp. v. New London Motors, Inc., 203 Conn. 342, 355 (1987); Sportsman Boating Corp. v. Hensely, 192 Conn. 747, 756 (1984).
IV. Damages —
The plaintiff claims recovery of a variety of damages including punitive damages, attorney's fees and costs.
BC BS would be entitled to any actual damages suffered as a result of DiMartino's conduct. See Conn. Gen. Stat. 35-53 (a)42-110g(a), 52-570b(c). In addition, BC BS would be entitled to recover damages for unjust enrichment not taken into account in calculation of actual damages. See id. 35-53 (a), 52-570b(c). Furthermore, because DiMartino's conduct was wilful and malicious, the plaintiff would be entitled to recover treble damages pursuant to 52-570b(c). However, because no actual damages were proven, no recovery may be awarded under these theories.
BC BS, however, claims an award of punitive damages under CUTPA, asserting that punitive damages are available upon a showing of reckless indifference to the rights of others or intentional and wanton violation of the rights of others. Gargano v. Heyman, 203 Conn. 616, 622 (1987). It is clear that, as plaintiff claims, punitive damages are available upon such a showing and in the discretion of the court even if the plaintiff has suffered no actual damages. Tilquist v. Ford Motor Credit Co., 714 F. Sup. 606, 617 (D.Conn. 1989). Based on the persuasive reasoning presented in this case, the court awards punitive damages to BC BS in the amount of $30,000.
In addition to punitive damages, BC BS is entitled to recover reasonable attorney's fees and costs. See Conn. Gen. Stat. 35-53 (b), 52-570b(e); 42-110g(d). Indeed, under 52-570b, governing actions for computer-related offenses, "the court shall award to any aggrieved person who prevails, reasonable costs and reasonable attorney's fees." Id. 52-57-b(e). Even if the plaintiff has suffered no actual damages, it may recover attorney's fees and costs under CUTPA. Freeman v. Alamo Mgmt. Co., 24 Conn. App. 124, 133 (1991). Accordingly, the plaintiff may recover the sum of $29,160 for reasonable attorney's fees and disbursements.
V. Permanent Injunction — CT Page 5956
Based on the uncontroverted evidence and by stipulation of the defendant, plaintiff is entitled to a permanent injunction which may issue as follows:
The foregoing matter having been tried to the court, based on the evidence and the stipulation as to the entry of a permanent injunction, it is hereby ORDERED that:
Defendant Carmen DiMartino and any agents, employees, or other persons acting in concert with him or participating with him either directly or indirectly are hereby permanently enjoined from directly or indirectly using, disclosing, disseminating, offering to sell or selling all confidential and proprietary information of Blue Cross Blue Shield of Connecticut, Inc., including, without limitation, information derived from the Blue Cross Blue Shield listing of group accounts by zip code, the Pool Rated Group Report, or other information relating to group accounts of Blue Cross Blue Shield of Connecticut, Inc., including the identities and addresses and telephone numbers of such groups, the underwriting assumptions and premium information concerning such groups, and the billing and accounts receivable information relating to such groups.
For the foregoing reasons, judgment may enter in favor of the plaintiff on all counts of the complaint for damages in the amount of $59,160 and for the foregoing permanent injunction, together with costs.
Barry R. Schaller, Judge